20-3503 from the Eastern District of Arkansas, Glenn Norris v. Kohler Company. And a note for the panel, Ms. Campbell, counsel for the appellant will be on the phone so there will be no video. Alright, Ms. Campbell, please open your argument. Good morning. May it please the court, I'm Sheila Campbell and I represent the appellant, Glenn Norris, in the case that he brought for discrimination based on his race as a result of the termination of his employment as the General Supervisor of Kohler. Mr. Norris was the only African American employee in management at the time that he was terminated from his employment. He had worked for Kohler approximately four years at that time. He was called into the office and was told that he was violating the company's conflict of interest policy which states that an associate's position must not be used directly or indirectly to obtain favors or benefits for themselves, family members, or any other person. Mr. Norris, when he started working for this company, the company was well aware that he was an independent insurance agency and from time to time he would sell insurance to employees at Kohler. But Kohler also were allowing other employees to sell other types of services to their employees and management, by the same token, was purchasing products from individuals that worked for their company. So this conflict of interest policy was never followed during the time that Mr. Norris was in court. Ms. Campbell, this is Ted Smith. Does the record show that there were allegations against the comparables that you mentioned of complaints from employees about the interactions of potential sales? In this case, were there any complaints made with respect to Mr. Norris? Well, at the time they called him in, they said that there had been a complaint made against him that one employee said that he was showing favoritism to individuals that he sold insurance to. But they would not reveal to him who made the complaint. It was only after the lawsuit was filed and discovery was obtained that he even knew that it was him who he allegedly showed favoritism to, but the company never came up with any evidence that any favoritism had been shown. The company conducted their own investigation and of the people that they took statements from, they selected these individuals that they wanted to survey to see if Mr. Norris had shown any favoritism. And the persons that they interviewed and obtained statements from said he never showed any favoritism toward anyone at that company. So there's been no evidence that Mr. Norris showed any favoritism to anyone. This is Ms. Robinson. Ms. Robinson, was there any evidence that at the time they terminated his employment that they didn't believe that he was showing favoritism to those who bought insurance from him? That the company didn't believe that? At the time that he was terminated. Well at the time that he was terminated they had conducted these surveys of employees and did an internal investigation which revealed to them that there was no favoritism shown. So I don't know how they could conclude that there was favoritism when they had no evidence to the contrary. Maybe I'm confused. I thought you said the internal investigation occurred at the time of the lawsuit. No, I said he learned what was in the internal investigation during the lawsuit. But the internal investigation occurred prior to being called into the office and him being confronted by the human resource manager and the plant manager that he was showing favoritism to employees. But based upon these statements that they took from these employees, which is at APP 522, all of the employees that they selected, and I don't know the basis of the selection of these particular employees, but you would assume that they worked closely with them. One was a supervisor, Mr. Stuckey, that I know worked closely with Mr. Norris. And there was no evidence that he was showing any favoritism toward any employee. Now what we learned in discovery was that there was a gentleman, Mr. Brazil, who wanted to go, he was supposed to go to the night shift, but he wanted to stay on the day shift. He complained about favoritism, however, he got to stay on the day shift. And the reason he got to stay on the day shift instead of going to the night shift is because one of the other employees that had more seniority opted to stay on the night shift. So that was no evidence that favoritism was shown. Rotation at that company from day shift to night shift depends upon seniority. And Mr. Norris has no control over changing a policy of seniority at that company. Counsel, was there any evidence that you had mentioned that there were other, that you discovered that there were other employees that were selling things, you mentioned that towards the beginning of your argument, or asking co-workers to participate in their own businesses or whatever. Did the company know that at the time that they terminated your client? Yes, sir. The company knew that. A 30-year employee, Sharon Craig, signed an affidavit at APP 496. She had been there 30 years, and she said the manager's employees were selling items to each other for the whole 30 years that she had been with this company. And the company knew that. It says in the affidavit that the company knew that. So it's one thing to say that we've been doing it for 30 years, but maybe nobody in charge knows it. Did the affidavit connect to the company's knowledge? Yes. It says that the managers and employees were selling to each other. And the policy, there were employees that were working there. One had an electrical company. One had a restaurant that they allowed this man to take orders and bring in food at lunchtime to the employees. One was an electric company where Mr. Nars said they did the majority of their business. Kola was doing the majority of their business with this electrical company. And the owner of the electrical company worked at Kola. So for them not to know, they did know. Because Kola is the biggest employer in this little town in Sheridan, Arkansas. So they were doing business with their employees. Their employees had businesses and they were doing printing services with one of their employees that had a printing company. So this is a pattern and practice of this company to do business which is in conflict with this conflict of interest policy. That policy was never carried out, at least in the 30 years that Ms. Craig was there. Counsel, you can't see our, Ms. Campbell, you can't see our clock, but you're down to about a minute and a half. And I wanted to see if you wanted to reserve your time. Oh, yes, Your Honor. That's fine. All right. Thank you. Ms. Hodges, you're muted. Of course, I would do that now. Thank you. Good morning and may it please the court. My name is Kim Hodges and I'm here representing Kola Company. I appreciate the opportunity to be here and to discuss the reasons why we believe this court should affirm the district court's decision granting summary judgment in Kola's favor. The district court correctly found that Mr. Norris had provided no competent summary judgment evidence sufficient to support a conclusion under the McDonnell-Douglas burden shifting paradigm that Kola's legitimate non-discriminatory reason for his termination was pretextual. At the time of his termination, Mr. Norris was a general supervisor in the Sheridan, Arkansas plant. He was responsible for overseeing employees who reported directly to him as well as some who were downstream from him. In addition to his employment at Kola, as the court's aware, Mr. Norris owned his private insurance company that at the time of his termination was operated through a business called Primerica. Mr. Norris was compensated through Primerica both on the insurance policies that he sold and on the commission spreads that his recruits would sell. He was motivated financially to both sell insurance policies... We're aware that employees in management had private businesses that they applied for at Kola? Sorry to interrupt. I don't know that I would say many. It certainly is not disputed that other employees had private business interests. That doesn't violate Kola's conflict of interest policy. The employees are permitted to have outside interests. The problem is when the outside interests get in the way of the work that they're doing for Kola. It's most conflict of interest policy. What's the facts in this case that indicate that the plaintiff's personal business interfered with Kola's? Your Honor, Kola received a complaint from two employees who indicated that not only would Mr. Norris... One complaint from two employees or two separate complaints from the two employees? Two separate complaints from individual employees, if I'm understanding the question correctly. I was a little unsure the way you stated it the first time, but now it makes sense. Thank you. They were two separate statements. Let me put it that way. Two separate statements and complaints brought to Kola stating that Mr. Norris would persistently discuss insurance, that every time he came out of his office and walked the floor, he was addressing his insurance business with other employees. Was that the actual statement every time he came out? No, all the time, all the time was the quote. Well, it's not much difference in meaning, but that's certainly a strong statement to make. Correct, Your Honor. It had reached the point that one of the employees stated that he would work to avoid running into Mr. Norris because he just didn't want to be subjected to a sales pitch. One of the complaining employees made the comment that she needed to sign up to sell insurance under his license with Primerica so that one day she could, quote, sit in an office with me. Another employee said that he had asked for a day shift, which he was ultimately granted, and that he made a comment to him that, now that I've got you on the day shift, you need to buy insurance from me. It also pressured this employee to connect him with his church. He held a leadership position in his church, pressured this employee to connect him with his church so that he could come make an insurance presentation. Kohler continued their investigation and interviewed a few other employees who said that they had felt pressured, that other employees told them they had felt pressured. They'd been asked to sell insurance. They'd been asked to buy insurance. Candidly, there were one or two employees who had been interviewed who indicated that they'd been asked to buy insurance but hadn't necessarily felt pressured. Kohler looked at the weight of the interviews that they conducted and also interviewed Mr. Norris, who admitted that he was selling insurance and recruiting insurance salespeople while at work, on work time, but of course denied that he had been pressuring anyone. Did Kohler uncover any evidence to support that favoritism actually had taken place or that changes in employee positions and employee privileges occurred because of his interactions? Yes, Your Honor. On page 433 of the record is an authorized corporate transaction report in which the management at Kohler is requesting approval within the company to move forward with the termination and it sets forth their conclusions. That report says that the investigation identified occurrences in which employees working for Glenn said that his request to buy or sell insurance, excuse me, employees complying with his request to buy or sell insurance were allowed to take off on mandatory overtime days and that the option to move to a more desirable shift was used as leverage. Through their investigation and in talking to Mr. Norris and to these employees, Kohler reached the conclusion, as all employers have to do at some point at the conclusion of an investigation, that Mr. Norris had used his position as the general supervisor to whom many employees either report directly or downstream to pressure employees into buying insurance or into selling insurance for them and had used his position and his ability to grant things such as days off to apply this pressure and for that reason made the decision to terminate him. I think it's important to note that Mr. Norris does not dispute that about 25 to 45% of his successful sales came from Kohler employees and that's of his successful sales. Kohler certainly had plenty of evidence through talking to employees and through the statements that came in from employees to support their conclusion and their honest belief that he was abusing his position to forward the personal interest of his outside business and frankly to make more money with his outside business. The district court looked at all of the investigation and the conclusions that Kohler reached and also looked at the fact that Mr. Norris in response to Kohler's motion for summary judgment had not presented any competent summary judgment evidence to show that any other employees had been treated more favorably than he had who were comparable to him and had not presented any evidence to show that Kohler was not justified in saying that they had an honest belief that he'd been abusing his position. On appeal to this court, Mr. Norris has done similarly. He has not pointed the court to any evidence in the record to show that there actually were employees who were comparable to him in all respects who received more favorable treatment. One thing that he does try to blur is his assertion that other employees were permitted to have outside businesses. That's just not the issue. Employees are permitted to have outside businesses and outside interests. The issue is whether there were any employees and more specifically complaints from employees that anyone had been using their position or pressuring other employees to purchase their services or somehow invest in their outside businesses. That's where Mr. Norris crossed the line and that's what ultimately caused his termination. I see I have just a little under a minute left. I'm happy to answer any other questions, but if there are none, then I'll yield the remainder of my time. Thank you, Ms. Hodges. Thank you. Ms. Campbell, you're closing in rebuttal. Your Honor, there were two complaints. The first complaint, as I stated previously, was from this Mr. Brazil who wanted to have his schedule changed, which the schedule did change because an employee with more seniority decided that he did not want to come to the day shift so that Mr. Brazil got to stay on the day shift. He would not have been able to stay on the day shift based on the seniority policy of Mr. Kohler. He complained about Mr. Norris, but Mr. Norris had no control over the seniority program of this company. He lucked out because Mr. DeMoss decided that he needed to stay home with his preschool children because his wife worked during the day. There was no favoritism. He operated the way the company ordered him to operate based upon seniority. The other complaint was a female individual. She asked to take off every Friday to go to college. He told her, I don't have the authority to do that, but if you go to Human Resources and they approve it, then it's fine with me. These individuals were coming to him wanting favoritism, which he was refusing to give them the favoritism. He was just trying to operate by the rules and regulations of this company. For her to say that it was all of these complaints, it was only two complaints, which Applebee's attorney admitted it was two complaints, which were baseless complaints because they were seeking seniority themselves. When Mr. Nars was called into the office, they said he was being terminated first because he was selling insurance. Then when he confronted them, you all knew I've been selling insurance for four years and you had said, oh no, it's not because you're selling insurance, it's because you're showing favoritism. Show me the evidence of where I've shown some favoritism. They refused to do that. To me, that's motive and pretext. If the man was showing favoritism, why would you refuse to show him what evidence you had and the statements that we finally got in discovery from the people that they investigated said he wasn't showing favoritism. Your time has expired. Thank you, your honor. Thank you very much. The court wishes to thank both counsel for your presence before us today in our virtual forum. We appreciate the argument you provided, the briefing that's been submitted and we'll take the case under advisement. Counsel may be excused.